William C. HUMPHREY, Regional Director of Region 5 of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Appellant,

v.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION AFL–CIO et al., Appellees.

No. 75–2281.

United States Court of Appeals, Fourth Circuit.

Argued June 9, 1976.

Decided Jan. 20, 1977.

Milford R. Limesand, Deputy Asst. Atty., Counsel, Washington, D.C., N.L.R.B. (John S. Irving, Jr., Gen. Counsel, Gerald Briss-man, Associate Gen. Counsel, Joseph E. Mayer, Asst. Gen. Counsel, Miriam B. Hart-ley, Atty., N.L.R.B., Washington, D.C., on brief), for appellant.

Braden Vandeventer, Norfolk, Va., C. P. Lambos, Thomas W. Gleason, New York, City (Sidney H. Kelsey, Kelsey & Kelsey, Norfolk, Va., Herzl S. Eisenstadt, Irwin Herschlag, Richard H. Kapp, New York City, Vandeventer, Black, Meredith & Martin, Norfolk, Va., Lorenz, Finn, Giardino & Lambos, Jacob Silverman and Donato Caruso, New York City, on brief), for appellees.

Before CRAVEN and RUSSELL, Circuit Judges, and MARKEY, Chief Judge, United States Court of Customs and Patent Appeals.*

DONALD RUSSELL, Circuit Judge.

■ This is an appeal from on order denying a temporary injunction sought by the Regional Director of the National Labor Relations Board under Section 10(*l*) of the National Labor Relations Act, 29 U.S.C. § 160(*l*),[1] pending resolution of charges filed with the Board by motor common carriers[2] alleging that the International Longshoremen's Association, AFL-CIO and its member local labor organizations in the Port of Hampton Roads[3] (ILA) and the Hampton Roads Shipping Association (HRSA), an association of steamship carriers employing ILA labor, had engaged and were engaging in unfair labor practices in violation of Section 8(e) of the Act, 29 U.S.C. § 158(e) (prohibiting "hot cargo"

---

* Sitting by Designation.

1. In pertinent part, Section 160(*l*) provides:
   If, after . . . investigation [of a charge that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of Section 158(b), or Section 158(e) or section 158(b)(7)], the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper . . .

2. Associated Transport, Inc., Houff Transfer, Inc., and Tidewater Motor Truck Association, an association of motor carriers in the Hampton Roads, Virginia area.

3. ILA Hampton Roads District Council, ILA Local 862, ILA Local 970, ILA Local 1248, ILA Local 1624, ILA Local 1783 and ILA Local 1784.

agreements)[4] and that the ILA had engaged in unfair practices in violation of § 8(b)(4)(ii)(B) of the Act, 29 U.S.C. § 158(b)(4)(ii)(B) (prohibiting "secondary boycotts").[5] For the reasons set forth below, we vacate the order entered by the district court and remand for entry of an appropriate injunction.[6]

The origins of this controversy lie in the drastic reduction in the amount of work available for longshoremen brought about by increasing use of containerization—the shipping of cargo in large enclosed boxes which can be loaded directly onto a ship. Because of its substantial impact on the employment of ILA labor, containerization, which first appeared in the Hampton Roads area in 1965, has been the subject of rules set forth in collective bargaining agreements between the ILA and representatives of the steamship carriers for the periods 1968–1971 (the 1968 contract), 1971–1974 (the 1971 contract) and 1974–1977 (the 1974 contract).[7] The rules set forth in the 1974 contract provide, *inter alia*, that if "full shipper's loads"[8] are "stripped" or "stuffed"[9] within a fifty-mile radius of the port's center other than by employees of the consignee (in the case of import goods) or the shipper (in the case of export goods), such work must be performed by ILA longshoremen or the offending carrier must pay $1,000 in "liquidated damages" per container which should have been loaded or discharged to the ILA joint Container Royalty Fund.[10] Following the adoption of these provisions, United States Lines, Inc., a member of HRSA, cancelled the Equipment Interchange Agreements[11] between it and

---

4. In pertinent part, Section 158(e) provides: It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void . . .

5. In pertinent part, Section 158(b)(4)(ii)(B) provides:

(b) It shall be an unfair labor practice for a labor organization or its agents—
* * * * * *
(4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is—
* * * * * *
(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . .

6. Since this appeal was argued before us, an Administrative Law Judge's decision finding that appellees have, in fact, violated Sections 8(b)(4)(ii)(B) and 8(e) has issued in the case. Therefore, the matter before us is almost moot, *Sears, Roebuck v. Carpet Layers* (1970) 397 U.S. 655, 90 S.Ct. 1299, 25 L.Ed.2d 637, *reh. denied* 399 U.S. 917, 90 S.Ct. 2190, 26 L.Ed.2d 576, and *Danielson v. International Bro. of Elec. Wkrs., L. U. 501* (2d Cir. 1975) 509 F.2d 1371, 1375. However, because there is, as yet, no final Board decision in the case, it is not technically moot and we must decide the issue before us.

7. The 1968 contract was negotiated by HRSA's predecessor, the Hampton Roads Maritime Association. The 1971 and 1974 contracts were negotiated by the Council of North Atlantic Shipping Associations (CONASA), an association of shipping associations, including HRSA, which was formed in 1970 with authority to enter into collective bargaining agreements on behalf of its members with respect to seven master items including containerization.

8. The term "full shipper's load" refers to a container fully loaded with goods from a single shipper destined for a single beneficial owner consignee.

9. The term "strip" means to remove the goods from a container. The term "stuff" means to load goods into a container.

10. The labor relations problems created by technological innovations in the handling of ocean-going cargo and this kind of attempt to deal with them are not unique to the east coast of the United States. *See* Washington Post, November 12, 1976, at A20, reporting the defeat in Parliament of a bill, supported by Great Britain's governing Labor Party, which "would have given [British] dock workers preference over railwaymen and other transport laborers in cargo handling jobs in an area extending five miles back from the waterfront."

11. Equipment Interchange Agreements are, in effect, leases which enable motor carriers to transport and use containers owned by ocean-

several motor carriers who refused to reimburse it for liquidated damages which it had to pay when they "stripped" full shipper's loads within the fifty-mile zone. Such cancellations effectively precluded the affected motor carriers from handling future United States Lines container cargo. The General Counsel contends, therefore that the rules and the conduct of the appellees in enforcing them create, in effect, an unlawful boycott of motor carriers who "strip" full shipper's loads within fifty miles of the port's center.[12] The district court, however, concluded that the challenged provisions are valid work preservation measures under the doctrine of *Woodwork Manufacturers v. NLRB* (1967) 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357, *reh. denied* 387 U.S. 926, 87 S.Ct. 2026, 18 L.Ed.2d 985 and denied injunctive relief.[13]

■ Our analysis begins with the rule of substantive law which will govern the Board's ultimate resolution of this controversy: regardless of the impact on other persons, union action and collective bargaining agreements which are intended to preserve work traditionally done by members of the bargaining unit do not contravene Sections 8(b)(4)(ii)(B) and 8(e) of the Act, *Woodwork Manufacturers v. NLRB, supra;* but labor contracts which are designed to acquire for members of the union work which they have not previously performed are unlawful if they expressly or impliedly require the employer to cease doing business with another person, *see, e.g., Local Union No. 98 of Sheet Metal Wkrs. In. Ass'n v. N.L.R.B.* (1970) 140 U.S.App. D.C. 83, 433 F.2d 1189, 1195 and *N.L.R.B. v. Local U. No. 141 of Sheet Metal Wkrs.' Int. Ass'n.* (6th Cir. 1970) 425 F.2d 730. From this statement of the rule, it is obvious that the primary question to be answered by the Board is whether the challenged rules are "work preservation" provisions of "work acquisition" measures.[14]

■ It is, however, neither necessary nor proper to resolve that issue finally at this preliminary stage. When considering a petition for temporary relief under Section 10(*l*), the function of the district court is not to decide the merits of the case but to determine whether the Regional Director has reasonable cause to believe that the respondents are violating the Act. *Sachs v. Local U. No. 48, United Ass'n. of J. & A. of Plumb., Etc.* (4th Cir. 1972) 454 F.2d 879, 882. Of course, this does not mean, as appellant argues and some courts have apparently held,[15] that even if the district court is convinced that the General Counsel's legal position is wrong, it must nevertheless grant the requested injunction so long as that position cannot be characterized as frivolous. *See* Judge Friendly's well-reasoned opinion in *Danielson v. Joint Bd.*

going carriers and which set forth their rights and obligations while doing so.

**12.** The General Counsel also contends that the ILA's exercise of its right, under the 1974 contract, to suspend the rules on containers on April 28, 1975, was a violation of Section 8(b)(4)(ii)(B) in that it was designed to place additional pressure on members of HRSA to cease doing business with motor carriers who insisted on stripping full shipper's loads within the fifty-mile zone. This suspension lasted until May 30, 1975.

**13.** With respect to the contention that the suspension of the rules on containers by the ILA constituted unlawful coercion under Section 8(b)(4)(ii)(B) (see note 12, supra), the district court concluded that injunctive relief was inappropriate because the issue was moot.

**14.** Appellees make no contention that because the rules on containers do not expressly prohib-

it HRSA members from dealing with motor carriers who "strip" full shipper's loads within the fifty-mile area, they cannot constitute a "hot cargo agreement." Because of the onerous conditions placed on transactions with such carriers by the rules, such a contention would be untenable, *Danielson v. International Or. of Mast. M. & P. AFL-CIO* (2d Cir. 1975) 521 F.2d 747, 753 n. 7 and *N.L.R.B. v. Amalgamated Lithographers of America (Ind.)* (9th Cir. 1962) 309 F.2d 31, 36, *cert. denied* 372 U.S. 943, 83 S.Ct. 936, 9 L.Ed.2d 968 (1963).

**15.** *E.g., Boire v. Pilot Freight Carriers, Inc.* (5th Cir. 1975) 515 F.2d 1185, 1189, *cert. denied,* 5 Cir., 521 U.S. 795; *Samoff v. Building & Const. Tr. Coun. of Philadelphia & V.* (3d Cir. 1973) 475 F.2d 203, 206–207, *vacated on other grds,* 414 U.S. 808, 94 S.Ct. 151, 38 L.Ed.2d 44 and *San Francisco-Oakland Newspaper Guild v. Kennedy* (9th Cir. 1969) 412 F.2d 541, 544.

*of Coat, Suit & Allied Gar. Wkrs. U.* (2d Cir. 1974) 494 F.2d 1230, 1239–1245, holding that adoption of the "insubstantial and frivolous" standard urged by some courts would be an abandonment of traditional equitable discretion unwarranted by either the language or the legislative history of Section 10(*l*). However, while a temporary injunction should not issue unless there is some reasonable possibility that the Board will ultimately enter an enforceable order, the General Counsel's resolution of disputed issues of law and fact should be accorded considerable deference in determining whether such possibility exists. *Danielson v. Joint Bd. of Coat, Suit & Allied Gar. Wkrs. U., supra,* 494 F.2d at 1245, and *Danielson v. International Or. of Mast., M. & P., AFL-CIO, supra,* 521 F.2d at 751. Where, as here, the Board's expertise in labor matters may be particularly useful because the case presents a difficult question as to the proper application of a legal standard to a complex industrial situation, the district court, acting without the benefit of full consideration of the issue by the Board, should be especially reluctant to conclude that the General Counsel's contentions are without merit.

■ Bearing these standards in mind, we conclude that the district court erred in finding that the Regional Director lacked reasonable cause to believe that the rules with respect to the "stripping" and "stuffing" of full shipper's loads within the fifty-mile zone are unlawful "work acquisition" measures. The reasons for this conclusion are apparent from a review of the role of longshoremen on the docks of the Hampton Roads area.

As established by the record, the traditional function of longshoremen is to load and unload the solid cargo of ocean-going ships at piers in the port area. Prior to the mid-1960's, most of this freight was "break bulk cargo"—loose boxes and bundles handled piece by piece. When loading ships, the longshoremen would unload such cargo from the trucks which brought it to the dock, prepare it for loading by stacking it on pallets and hoist it aboard ship. During off-loading, the longshoremen would remove the cargo-bearing pallets from the ship, sort the goods according to consignee and type and transport them to the end of the pier for loading onto trucks. Insofar as the record shows, the work of the longshoremen with respect to import cargo ended at the tailgate of the truck.

Containerized cargo first appeared in the Hampton Roads port area in 1965.[16] During the period 1965–1967, when there was no collective bargaining agreement covering containerization, ILA longshoremen "stripped" containers holding goods destined for more than one consignee (consolidated container loads).[17] During the same period, however, the general practice with regard to full shipper's loads was for longshoremen merely to remove the container from the ship and place it on the pier where it was picked up by a motor carrier. Occasionally, longshoremen would "strip" such containers at the stevedore's request.

Since 1968, the collective bargaining agreements between the ILA and the steamship carriers have provided that certain consolidated container loads must be "stripped" and "stuffed" by ILA longshoremen or the offending shipping line must pay liquidated damages to the joint Container Royalty Fund.[18] Until 1974, how-

---

16. A precursor of containerization, Conex boxes, appeared in the port area during World War II and the Korean War. These were military boxes not owned by the steamship lines. They were loaded by the government with ammunition, household goods, electronic equipment, *etc.* and were not "stripped" by ILA labor. Under the current rules, containers bearing military goods continue to be exempt from ILA stripping and stuffing.

17. Industry terminology uses several terms such as less-than-trailer load (LTL) cargo, less-than-container load (LCL) cargo and consolidated full container load (CFCL) cargo to describe various types of container loads other than full shipper's loads. However, for convenience, we will use the phrase "consolidated container load" to refer to all such container loads.

18. The consolidated container loads to which these provisions apply are those destined for or

ever, there was no express provision giving ILA labor the right to "strip" or "stuff" any full shipper's loads.[19]

From the inception of containerization in the Port of Hampton Roads, motor carriers picking up unstripped full shipper's loads at the docks have often taken them to their port area terminals, stripped the cargo from the container and loaded it into their own trailers. A trucking firm may follow this practice in a particular instance for any of several reasons: to comply with ICC or state highway weight limits and weight distribution regulations, to eliminate safety problems,[20] to avoid per diem charges on containers owned by shipping companies by hauling the cargo in the motor carrier's own equipment which might otherwise be idle, or to use the motor carrier's tractors more efficiently by consolidating two or more container loads into a single trailer.[21]

From this brief summary of the factual background, it would seem evident that the "stripping" of these full shipper's loads by the truckers is not part of the process of loading and unloading the cargo of ships; rather it is done to facilitate and as part of the motor carrier's task of transporting the goods from the pier to the consignee.[22] Consequently (and not surprisingly), this work has traditionally been performed by employees of the motor carrier. It follows that such "stripping" does not fall within the bounds of the longshoremen's traditional role and that the challenged rules are unlawful "work acquisition" measures, *International Longshoremen's Ass'n v. NLRB* (2d Cir. 1976) 537 F.2d 706, *enforcing, International Longshoremen's Ass'n (Consolidated Express, Inc.)*, 221 NLRB No. 144 (1975).[23]

■ Thus, if this matter were before us for final decision, we would be inclined to

---

coming from any person within the fifty-mile zone who is not the beneficial owner of the cargo.

**19.** Appellees contend, however, that this right was impliedly protected by the 1968 and 1971 contracts. In support of this position, they point to evidence that, on some occasions during the 1968–1974 period, liquidated damages were assessed against shipping lines by the ILA and HRSA because full shipper's loads had been "stripped" by truckers. The court below rejected appellees' contention and concluded that such "fines" had been imposed "erroneously." (We note that appellees' position is also rejected by the Administrative Law Judge's decision in the case [*see* note 6 *supra*] which finds that, at most, only one of the occasions on which appellees rely occurred prior to the September, 1972 meeting at which the provisions now under challenge were first proposed.)

**20.** For example, in the case of a load bound for West Virginia, a container packed to its roof might be too susceptible to turning over on narrow mountain roads. In such event, the goods might be transferred from the container to the trucker's trailer in order to lower the load's center of gravity.

   As another example, there was evidence that the tires on container chassis tend to blow out more often than those on trucker-owned trailers.

**21.** A container might also be "stripped" in order to consolidate its cargo with non-containerized freight (*e. g.* goods not originating overseas and never handled by a shipping line) bound for the same destination.

**22.** It is of interest that, under the 1974 contract, a shipping line is not subject to fine if a trucker "strips" a full shipper's load outside the fifty-mile area (except where existing patterns of consolidation are changed in order to evade the rules). If the act of "stripping" the cargo from a container and loading it into other equipment, done to meet the motor carrier's convenience or necessity, is not part of the process of loading or unloading ships when it is carried out at the motor carrier's terminal in Richmond or Durham, then it is difficult, on the record before us, to understand why the same act, performed for the same purpose, is a part of that process when accomplished at the carrier's Norfolk terminal.

**23.** The Second Circuit's decision in *Consolidated Express* sustaining the Board's finding that the rules with respect to "stripping" and "stuffing" consolidated container loads (see note 18 and accompanying text *supra*) as applied in the Port of New York violated Sections 8(e) and 8(b)(4)(ii)(B), is particularly persuasive in support of appellant's position in this case. It is difficult to perceive any rational basis for concluding that the rules with respect to full shipper's loads are more directed at "work preservation" within the meaning of the *National Woodwork* doctrine than those concerning consolidated container loads. Therefore, in order to prevail in this controversy, appellees would have to convince the Board—or this court on appeal from an adverse final decision of the Board—that *Consolidated Express* was wrongly decided or demonstrate the existence of some controlling factual distinction which is not apparent on the record now before us.

hold that the rules with respect to the "stuffing" and "stripping" of full shipper's loads constitute a "hot cargo agreement" in violation of Section 8(e). Consequently, we conclude that appellant has ample reasonable cause to believe that appellees are violating the Act.[24] Appellant should, therefore, have been granted a temporary injunction prohibiting appellees from enforcing the challenged rules until this controversy has been finally resolved by the Board.[25]

■ For the reasons stated, the order below is vacated and the case is remanded for entry of an appropriate injunction[26] pursuant to Section 10(*l*) of the Act.

*VACATED AND REMANDED.*

CRAVEN, Circuit Judge, dissenting:

Without so much as a wasted word, my brother Russell has accurately and fairly recited the evidentiary facts, correctly framed the question, and exposited the law to be applied to the facts to determine whether the district judge abused his discretion in denying a temporary injunction sought by the Regional Director. I agree especially with Judge Russell that the primary question is "whether the challenged rules are 'work preservation' provisions or 'work acquisition' measures."

In order to answer that question, it is essential to define precisely the work in controversy. My brothers fall into the same error that occasioned an erroneous decision, it seems to me, in *International Longshoremen's Assoc. v. NLRB*, 537 F.2d 706 (2d Cir. 1976). In that case the Board, and later a majority of the court, treated the "work in controversy" as "the LCL and LTL container work performed by [trucking companies] at their own off-pier premises." In the course of dissenting, Judge Feinberg pointed out that the definition was incorrect because it focused on work done in the relatively recent past by trucking companies rather than on the work done traditionally and over a longer period of years by the longshoremen.

Containerization is relatively new. The loading and unloading of ships outruns history. The work to be preserved is the

---

In fairness to the court below, we note that neither the Board's decision nor the Second Circuit's opinion had issued in *Consolidated Express* when the order denying appellant's petition for temporary relief under Section 10(*l*) was entered in this case. The only opinion then extant was that of the Administrative Law Judge (subsequently reversed), concluding that there had been no violation of the Act.

**24.** This conclusion is bolstered by the fact that the Administrative Law Judge's decision (*see* note 6 *supra*) sustains the General Counsel's position. We note also that, in a substantially similar case arising from the Port of Baltimore, another district court has concluded that there is reasonable cause to believe that the challenged rules violate the Act, *Humphrey v. ILA* (D.Md. No. Y–75–1395, decided March 25, 1976).

Other circuits have disagreed as to whether the determination that reasonable cause exists or does not exist is a finding of fact to be reversed only if clearly erroneous or a conclusion of law subject to full appellate review, *compare Squillacote v. Graphic Arts Int. U. (GAIU) Local 277* (7th Cir. 1975) 513 F.2d 1017, 1021 *with Danielson v. Joint Bd. of Coat, Suit & Allied Gar. Wkrs. U., supra*, 494 F.2d at 1244. Because we conclude that appellant would be

entitled to reversal under either standard, we need not address that issue.

**25.** The record shows that those motor carriers whose Equipment Interchange Agreements have been cancelled stand to lose substantial business so long as those cancellations remain in effect. They have, therefore, demonstrated sufficient likelihood of harm pending final adjudication to warrant interim relief under Section 10(*l*). *See Humphrey v. Drivers, Chauffeurs & Helpers Local 639* (D.Md.1974) 369 F.Supp. 730, 739–740.

**26.** Examination of the record reveals reasonable cause to believe that the ILA's suspension of the rules on containers in April, 1975 (see notes 12 and 13 *supra*) was intended to pressure members of HRSA into cancelling the Equipment Interchange Agreements of motor carriers who "stripped" full shipper's loads and that the suspension was, therefore, in violation of Section 8(b)(4)(ii)(B). Such conduct being obviously capable of repetition, it would be appropriate for the injunction entered on remand to prohibit future suspension for similar purposes, *see Squillacote v. Graphic Arts Int. U. (GAIU) Local 277, supra*, 513 F.2d at 1023, n. 11.

loading and unloading of ships. To focus entirely upon stripping and stuffing containers is to utterly ignore the traditional work of seamen and longshoremen, for there can be nothing traditional nor even long-established about containerization practice. Judge Merhige recognized the distinction clearly when he quoted from the parties' agreement of October 1, 1974:

> The provisions are intended to protect and preserve the work jurisdiction of the longshoremen and all other ILA crafts which was performed at deep-sea waterfront facilities. The rules do not have any effect on work which historically was not performed at a waterfront facility by deep-sea ILA labor.

As Judge Feinberg said, "if the work is defined as the work the ILA members used to do on the pier before containerization moved most of it off the pier, the case takes on a different cast."

I am respectfully of the opinion that my brothers commit an error of law by focusing on the wrong "work" in deciding whether the longshoremen are protected by *National Woodwork* and its doctrine permitting work preservation. Looking at the work the longshoremen seek to preserve, their traditional work of loading and unloading ships, I think it becomes apparent that the Regional Director lacked reasonable cause to believe that rules with respect to the stripping and stuffing of containers within the 50-mile zone are unlawful "work acquisition" measures. Twenty years ago the longshoremen had it all. Now they seek only to retain a part of it. This is not to me "work acquisition." I think Judge Merhige wisely considered all of the factors and did not abuse his discretion in denying the prayer for preliminary injunction. I would affirm.