**William C. HUMPHREY, etc.**

**v.**

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, et al.**

**Civ. A. No. 75–441–N.**

United States District Court,
E. D. Virginia,
Norfolk Division.

Sept. 30, 1975.

Bruce Rosenstein, N. L. R. B., Reg. 5, Baltimore, Md., for plaintiff.

Sidney H. Kelsey, Sr., Norfolk, Va., for Int. Longshoremen.

Braden Vandeventer, Jr., Norfolk, Va., for Hampton Rds. Shipping.

Thomas W. Gleason, New York City, for Kelsey.

C. P. Lambos, New York City, for Van Deventer.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MERHIGE, District Judge.

William C. Humphrey, Regional Director of Region 5 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, brings this petition for a temporary injunction against respondents, International Longshoremen's Association, AFL–CIO, International Longshoremen's Association, AFL–CIO, Hampton Roads District Council; International Longshoremen's Association, AFL–CIO, Local 846; International Longshoremen's Association, AFL–CIO, Local 862; International Longshoremen's Association, AFL–CIO, Local 970; International Longshoremen's Association, AFL–CIO, Local 1248; International Longshoremen's Association, AFL–CIO, Local 1624; International Longshoremen's Association, AFL–CIO, Local 1783; International Longshoremen's Association, AFL–CIO, Local 1784 (hereinafter collectively the I.L.A.), and Hampton Roads Shipping Association (hereinafter Hampton Roads), for violations of §§ 8(b)(4)(ii) and 8(e) of the National Labor Relations Act (hereinafter Act). Jurisdiction is conferred on this Court by Section 10(*l*) of the Act. 29 U.S.C. § 160(*l*)(1970).

The evidence, both stipulated and contraverted, establishes that on May 7 and 12, 1975, Associated Transport, Inc. (hereinafter Associated), a New York corporation, filed a charge and amended charge against all the I.L.A. respondents with the National Labor Relations Board alleging that I.L.A. has engaged in, and are engaging in, unfair labor practices within the meaning of § 8(b)(4)(ii) of the Act, and that respondents I.L.A. and Hampton Roads have engaged in and are engaging in unfair labor practices within the meaning of § 8(e) of the Act. On May 12, 1975 Houff Transfer, Inc. (hereinafter Houff), a Virginia corporation, filed similar charges with the Board, and on May 13, 1975 Tidewater Motor Truck Association (hereinafter Tidewater), an employer association of 28 employer members operating trucking businesses in the Hampton Roads, Virginia area, including but not limited to Houff and Associated, also lodged similar charges with the Board against the respondents. At all times material to this petition, Associated and Houff shipped goods and materials valued in excess of $50,000 in interstate commerce from ports in this District to points located outside the State of Virginia.

Respondent I.L.A. is a group of unincorporated associations that deal with employers on behalf of employees on matters of employee grievances, labor disputes, wages, rates of pay, hours of employment, and conditions of work. It is stipulated that I.L.A. is a group of "labor organizations" within the meaning of §§ 2(5), 8(b), and 10(*l*) of the

Act. At all times material to this petition, respondents I.L.A. Local 846 and 862 have maintained their principal offices in Newport News, Virginia, and I. L.A. Local 970, 1248, 1624, and 1783 have maintained their principal offices at Norfolk, Virginia. I.L.A. Local 1784 has maintained its principal office at Hampton, Virginia. Respondents I.L.A. International Council and Hampton Roads District Counsel maintain offices in Norfolk, Virginia, and at all times material to this petition have transacted business in Norfolk, Virginia. Respondent Hampton Roads is an organization of various steamship lines that bargains collectively on behalf of its member employers with labor organizations including but not limited to I.L.A., concerning wages, hours, working conditions, and other conditions of employment. Among the employer members of respondent Hampton Roads is United States Lines, a steamship line shipping, at all times material to this petition, cargo by ocean-going vessels in interstate and foreign commerce into various United States ports, including Hampton Roads, Virginia. This cargo often consists of goods loaded in "containers," uniformly sized metal boxes owned by United States Lines.

It is stipulated that I.L.A. members, at all times material to this petition, perform work at the piers of Newport News, Norfolk and Hampton Roads, Virginia unloading U.S. Lines' containers from its steamships pursuant to collective bargaining agreements negotiated by and between I.L.A. and CONASA, (the Council of North Atlantic Shipping Associations) which represents several employer shipping associations, including but not limited to Hampton Roads Shipping Association. At no time material herein have Associated, Houff, or any employer-members of Tidewater been a member of Hampton Roads Association, a party to any of the Hampton Roads-I.L.A. agreements, or had any employee represented by, or a member of, I.L.A.

On September 24, 1974 and on October 1, 1974, four fully loaded containers from the S. S. American Legion and the S. S. American Aquarius, respectively, were discharged at Norfolk, Virginia, picked up by Associated on each of said dates for transportation and delivery to consignees in an area more than fifty miles from the port. Each of these containers contained cargo to be delivered solely to one consignee. In each instance the Associated driver hauled the containers to Associated's terminal, less than fifty miles from the port, where they were unloaded ("stripped") and the cargo from each container reloaded into Associated's truck trailers. On October 5, 1975 Mr. Queen of U.S. Lines and Mr. Merritt of I.L.A. arrived at the terminal and inspected the eight containers, finding that the seal had been broken on each and the containers stripped. I.L.A. subsequently charged U.S. Lines with a violation of Rule 1(a)(3) and Rule 2(B)(2) of the October 1, 1974–September 30, 1977 CONASA–I.L.A. Rules on Containers, a collective-bargaining agreement entered into by and between the employer-members of Hampton Roads and I.L.A. The pertinent provisions are as follows:

Definitions: (b) Discharging a Container—means the act of removing cargo from a container.

(d) Discharging Containers from a vessel—means the act of removing containers from a vessel.

(e) Waterfront facility—means a pier or dock where vessels are normally worked including a container compound operated by a carrier or direct employer.

(g) Qualified Consignee—means the purchaser or one who otherwise has a proprietary financial interest (other than in the transportation or physical consolidation or deconsolidation) in the import cargo being transported and who is named in the delivery order.

(h) Consolidated Container Load—means a container load of cargo

where such cargo belongs to more than one shipper on export cargo or one consignee on import cargo.

Rule 1—Containers to be Loaded or Discharged by Deepsea I.L.A. Labor.

(a) Cargo in containers referred to below shall be loaded into or discharged out of containers only at a waterfront facility by deepsea I.L.A. labor.

(1) Containers owned, leased or used by carriers (including containers on wheels and trailers), hereinafter "containers," which contain consolidated container loads, which come from or go to any point within a geographic area of any CONASA port described by a 50-mile circle with its radius extending out from the center of each port, (hereinafter "geographic area") or

(2) . . .

(3) Containers designated for a single consignee from which the cargo is discharged (deconsolidated) by other than its own employees within the "geographic area" and which is not warehoused in accordance with Rule 2(B).

Rule 2—Containers Not to be Loaded or Discharged by I.L.A. Labor:

.    .    .    .    .    .

B.  Import Cargo:

(1) . . .

(2) Containers discharged at a qualified consignee's facility by its own employees.

In accordance with Rule 9 of the contract, a joint I.L.A.-Hampton Roads grievance committee, the "CONASA-I. L.A. Container Committee," met on October 31, 1974, heard the charges, and levied fines of $8,000 against U.S. Lines ($1,000 for each container improperly stripped). U.S. Lines paid the fine, and by letter of November 7, 1974, requested that Associated indemnify it for its payment of the penalty. Associated refused, asserting that it was not a party to Hampton Roads-I.L.A. agreements, and that it should not be bound by fines negotiated in accordance with such agreements. As a result of Associated's refusal, U.S. Lines formally terminated, on March 20, 1975, the Associated-U.S. Lines Equipment Interchange Agreement. The Interchange Agreement enabled Associated to transport and otherwise handle containers owned by U.S. Lines so as to transport the cargo of the container to the intended consignees. The termination of the agreement effectively precluded Associated from further handling any U.S. Lines container cargo, despite requests from shipping brokers and consignees that Associated do so. The evidence indicates that Associated lost a substantial amount of container business.

The above facts are substantially identical with those involving the cancellation by U.S. Lines of the Equipment Interchange Agreements with Houff and other employer-members of Tidewater.

In March 1975, in accordance with Rule 8 of the container rules, I.L.A. notified CONASA and respondent Hampton Roads of its intent to renegotiate the container rule. The parties were unable to reach an agreement, and I.L. A., on April 28, 1975, suspended what is referred to as the 30-day warehouse clause. That clause is designated Rule 2B(4)

Containers of a qualified consignee discharged at a bona fide public warehouse within the "geographic area" which comply with all of the following conditions.

1.  The container cargo is warehoused at a bona fide public warehouse.

2.  The qualified consignee pays the normal labor charges in and out; and the normal warehouse storage fees for a minimum period of thirty or more days, and;

3.  The cargo being warehoused (a) in the normal course of the busi-

ness of the qualified consignee; (b) title to such goods has not been transferred from the qualified consignee to another.

The rules on containers, including the 30-day warehouse clause, were reinstated by agreement between I.L.A. and Hampton Roads on May 30, 1975.

It is argued by the petitioners that the grievance procedure operates to effect a "secondary boycott" against their business of stripping and transporting the goods from fully loaded and unconsolidated "containers". The petitioners seek immediate injunctive relief to prohibit I.L.A. from further fining employer-members of Hampton Roads for acts similar to those taken by Associated in the instant case, and to prohibit I.L.A. and Hampton Roads from further interpreting and/or enforcing those provisions of the collective-bargaining agreement that cause fines to be levied on employer-members of Hampton Roads for acts similar to those taken by Associated in the present case.

The Court, to grant the relief sought, must conclude that there is reasonable cause to believe that the pending charges against the respondent for unfair labor practices are well taken, and that such relief is just and proper under the circumstances of this case. 29 U.S. C. § 160(*l*) (1970) states in part, in reference to the granting of a temporary injunction, that the Court decree "as it deems just and proper." *See Call Carl, Inc. v. B. P. Oil Corp.,* No. 74–1819 (4th Cir., April 1975); *Leeward v. Crown Central Petroleum,* No. 75–1042 (4th Cir., June 19, 1975); *Consolidation Coal Co. v. Disabled Miners of Southern West Virginia,* 442 F.2d 1261 (4th Cir. 1971); *West Virginia Highlands Conservancy v. Island Creek Coal Co.,* 441 F.2d 232 (4th Cir. 1971); *Johnston v. J. P. Stevens & Co.,* 234 F.Supp. 244, 249 (E.D.N.C. 1964), *aff'd.,* 341 F.2d 891 (4th Cir.

1965); *Penello v. International Longshoremen's Assoc., Local 1248,* No. 71–280–N (E.D.Va.1971).

The Supreme Court has held that congressional grants of injunctive power to the federal courts in specified areas do not operate to limit the flexibility of the courts' traditional equity powers with respect to the exercise of those grants unless such restrictions are express in the legislation. *Hecht v. Bowles,* 321 U. S. 321, 64 S.Ct. 587, 8 L.Ed. 754 (1944). Finding no express limits on this Court's equitable powers in the National Labor Relations Act, this Court in determining the instant issue treats enforcement proceedings under the Act consistent with its traditional equity practices, *conditioned* by the necessities of public interest which Congress sought to protect in enacting the National Labor Relations Act. *See Consolidation Coal Co. v. Disabled Miners of Southern W. Va., supra,* 442 F.2d 1261 (4th Cir. 1971); *The West Virginia Highlands Conservancy v. Island Creek Coal Co., supra,* 441 F.2d 232 (4th Cir. 1971). There is admittedly authority to the contra. *See Schauffer v. Local 1291, International Longshoremen's Assoc.,* 292 F.2d 182 (3d Cir. 1961); *Douds v. International Longshoremen's Assoc.,* 242 F.2d 808, 811–812 (2d Cir. 1957).

The Court finds from this record that the contract of October 1, 1974 specifically prohibits U.S. Lines from permitting its containers that are fully loaded and designated for a single consignee to be stripped by anyone other than the employees of that consignee within the "geographic area" referred to in the contract—fifty miles. Hence the actions of the Container Grievance Committee in fining U.S. Lines for the stripping of at least four of the containers in issue were appropriate pursuant to Rule 9 of the Rules on Containers in the 1974 Collective Bargaining Agreement.[1]

---

1. An arguable issue as to the validity of the fines levied on U.S. Lines for containers taken off the S.S. American Legion and dispatched prior to October 1, 1974 is of no importance as to the propriety of granting or, as the Court here does, denying the injunctive relief prayed for.

It has long been held that work preservation provisions are valid and enforceable parts of labor-management collective-bargaining agreements, even if those provisions operate to deprive other interested labor of the opportunity to perform the work so protected. *National Woodwork Manuf. Assoc. v. NLRB*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); *Intercontinental Container Transport Corp. v. NYSA, Inc.*, 426 F.2d 884 (2d Cir. 1970). The issue, then, is whether the contract provisions in question, Rule 1(a)(3) and Rule 2B(2), are valid work preservation provisions. In resolving the question, this Court must carefully analyze the history of container traffic in the Port of Hampton Roads.

For several decades, employees represented by the I.L.A. have performed essentially all the labor required in loading and unloading cargo at piers and waterfront terminals in the Port of Hampton Roads. This work included cargo repair and maintenance, the preparation of cargo for loading, the sorting of cargo according to consignees and types, and the delivery of cargo to trucks on other inland carriers, as well as the physical loading and unloading of cargo ships.

Containerization, the handling of cargo in large enclosed boxes, first appeared in 1965 in the Port of Hampton Roads. It threatened to drastically reduce the number of man-hours required to handle cargo, and thereby diminish substantially the work available for longshoremen. As a result, containerization became a major subject of collective bargaining, and the disputes surrounding the procedure's effect on the shipping industry culminated in a 56 day strike in 1968. I.L.A. and Hampton Roads settled their differences by way of the Containerization Clause and "Rules on Containers," first effective on October 1, 1968. Two subsequent contracts have been negotiated that include the Rules—one effective November 14, 1971 to September 30, 1974, and one effective on October 1, 1974 to September 30, 1977.

Previous to the 1968 effective date of the first contract containing the Rules, I.L.A. workmen stripped any containers that the stevedores indicated they should strip, including those holding "full container loads," fully loaded containers intended for a single consignee. The 1968 and 1971 contracts, however, preserved to I.L.A. labor only the work of stripping less than full containers and containers with goods intended for more than one consignee. They did not preserve the stripping, even if close to the dock, of full container loads. It was not until 1974 that the Rules were redrafted to preserve for I.L.A. labor the stripping of full shippers loads done within a fifty mile radius of the Port (unless the stripping was done by the consignee's employees). These redrafted rules are the subject of the dispute in this case.

There was, then, a lapse of eight years in which the longshoremen did not have the right, under the then effective contracts, to exclusively strip full shipment loads. This lapse was, the Court is satisfied, bottomed on a lack of comprehension of what was, during much of this period, a new concept of cargo transportation. Appreciable container traffic wasn't introduced in this area until the early 70's. This lack of comprehension is evidenced by the I.L.A.-Hampton Roads Container Committee's misapplication of the 1968 and 1971 Rules on Containers in erroneously fining shipping lines for the stripping and reloading of full container loads by truckers during that period.

The degree of misapprehension under which the parties operated is also demonstrated by the extent of what was lost under the 1968 and 1971 contracts. A trucker picking up on the dock a fully loaded container consigned to a single consignee could have, under those contracts, with non-I.L.A. labor, broken the seal and transferred, right on the dock, the contents of the containers to its

truck. This, under any definition, would be dock loading and unloading—work which was historically performed by longshoremen. The newness of the concept of containerization, coupled with the adjustment time needed by all the industries affected by the process, must be expected to create temporary maladjustments in the legal agreements of the affected parties.

The Court concludes that the contract provisions in issue were intended and operate solely to preserve historical work practices, and that the eight year period during which the work in issue was not protected by contract does not serve to extinguish I.L.A.'s right to preserve by contract the right to strip full shipper loads within fifty miles of port in 1974. Supplemental but not determinative of the Court's independent conclusion as to this factual issue is the language contained in the parties' agreement of October 1, 1974 to the effect that *"the provisions are intended to protect and preserve the work jurisdiction of the longshoremen and all other I.L.A. crafts which was performed at deepsea waterfront facilities. The rules do not have any effect on work which historically was not performed at a waterfront facility by deepsea I.L.A. labor."* [2]

The action here complained of may be aptly descripted, to borrow a phrase of Mr. Justice Brennan, not as a sword to reach out for monopolistic purposes or the acquisition of *new* job tasks, but as a shield carried solely to preserve work which historically has been that of the members of respondent unions. Such is not an unfair labor practice. Re-acquisition and preservation of traditional work is the purpose of the respondent union's actions, and this is both appropriate and legal. *National Woodwork Mfrs. Asso. v. N.L.R.B.*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); *see American Boiler Mfrs. Asso. v. N.L.R.B.*, 404 F.2d 547 (8th Cir. 1968). The Court finds that there is no reasonable cause to believe that Rules on Container 1a(3) and 2B(2) operate to create unfair labor practices in violation of the National Labor Relations Act.

The specific request for injunctive relief in reference to the suspension of the Warehouse Clause (Rule 2B(4)), under this record is inappropriate under the standard by which this Court is bound, for the issue is moot. Injunctive relief is no longer a proper remedy.

An appropriate order will issue.

2. Additionally, the parties to the 1974 agreement recognized the infringement of I.L.A. historical work function for even the traffic in exempt containers (less than full load, consolidated loads, etc.) by providing for a $2.00 per ton royalty to the I.L.A. for all exemptions referred to in the contract.