AMERICAN TRUCKING ASSOCIATIONS, INC. and Tidewater Motor Truck Association, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Houff Transfer, Intervenor/R

NYSA, ILA and CONAS, Intervenors/P

International Brotherhood of Teamsters, Intervenor/P

American Warehousemen's Assoc., Intervenor/P

INTERNATIONAL ASSOCIATION OF NVOCCs,

and

Florida Custom Brokers and Forwarders Association, Inc.

and

Twin Express, Inc.,

and

International Container Express, Inc., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

San Juan Freight Forwarders, Inc., Intervenor.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, Hampton Roads District Council; International Longshoremen's Association, AFL–CIO, Atlantic Coast District Council; ILA Locals 333, 846, 862, 921, 953, 970, 1248, 1355, 1429, 1458, 1624, 1736, 1783, 1784, 1819, 1840, and 1970, AFL–CIO; International Longshoremen's District Council, Baltimore, Maryland; International Longshoremen's Association, Local 953; International Longshoremen's Association, Local 333; International

Longshoremen's Association, Atlantic Coast District, AFL–CIO; International Longshoremen's Association, Local 333, AFL–CIO; International Longshoremen's Association, Local 953, AFL–CIO; International Longshoremen's Association, Locals 1416, 1416–A, 1680, 1526, 1526–A, and 1922, AFL–CIO; Hampton Roads Shipping Association; Southeast Florida Employers Port Association; Coordinated Caribbean Transport, Inc.; Chester, Blackburn & Roder, Inc.; Eagle, Inc.; Eller & Company, Inc.; Harrington & Company, Inc.; Strachen Shipping Company and Marine Terminals, Inc., Respondents.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, New York Shipping Association, Inc., and Council of North Atlantic Shipping Association, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Houff Transfer, Inc.; The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Teamsters"); American Trucking Associations, Inc. ("ATA") and Tidewater Motor Truck Association ("TMTA"), Intervenors.

Nos. 83–1185(L), 83–1214, 83–1424 and 83–1486.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 12, 1984.

Decided May 9, 1984.

As Amended June 18, 1984.

Rehearing and Rehearing En Banc Denied July 31, 1984.

J. Alan Lips, Cincinnati, Ohio (Mark S. Sauter, Mark E. Lutz, Taft, Stettinius & Hollister, Cincinnati, Ohio, on brief); Donato Caruso, New York City (C.P. Lambos, Nicholas G. Maglaras, Lambos, Flynn, Nyland & Giardino, New York City, on brief); Ernest L. Mathews, Jr., New York City (Thomas W. Gleason, New York City, Francis A. Scanlan, Deasey, Scanlan & Bender, Ltd., Philadelphia, Pa., Braden Vandeventer, Vandeventer, Black, Meredith & Martin, Norfolk, Va., Nelson J. Cooney, American Trucking Associations, Inc., Washington, D.C., Paul M. Thompson, Christine H. Perdue, Hunton & Williams, Richmond, Va., Raymond P. deMember, Garson, deMember & Weiner, Fairfax, Va., Mahlon G. Funk, Jr., Hirschler, Fleischer & Weinberg, Richmond, Va., William L. Auten, Blakeney, Alexander & Machen, Charlotte, N.C., Arthur Liberstein, P.C., New York City, William H. Towle, Burke, Kerwin, Towle & Andrin, Chicago, Ill., Roland P. Wilder, Jr., David J. Gzesh, Washington, D.C., on brief), for petitioners.

Linda Dreeben, N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Howard E. Perlstein, Patrick J. Szymanski, N.L.R.B., Washington, D.C., on brief), for respondent.

Before HALL and PHILLIPS, Circuit Judges, and MAX ROSENN, Senior Circuit Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.

ROSENN, Senior Circuit Judge:

This case, in which nine different proceedings of the National Labor Relations Board (the Board) have been consolidated after a remand by the United States Supreme Court, requires us to carefully examine the emergence and development of a technological breakthrough in the shipping industry known as containerization. In particular, we must decide whether the Rules on Containers (the Rules), negotiated by the International Longshoremen's Association (ILA or Union) and various employer associations representing east coast shipping lines, violate the secondary boycott proscriptions of sections 8(e) and 8(b)(4)(B) of the National Labor Relations Act, 29 U.S.C. §§ 158(e) and 158(b)(4)(B). The Board held that, with two exceptions, the Rules are lawful. We hold that the Rules are valid in all respects.

I.

Although the Supreme Court[1] has described the history of containerization, some of it must be reiterated for an understanding of our decision. Prior to the advent of what has come to be termed "the container revolution,"[2] the movement of ocean-borne cargo at the pier contained two distinct stages. Truckers first delivered loose ("break-bulk") cargo to the terminal at the head of the pier. Longshoremen employed by steamship or stevedoring companies then transferred the cargo piece by piece from the tailgate of the truck to the hold of the outgoing ship, checking it, sorting it, placing it on pallets, moving it by forklift to the side of the ship, and lifting it into the hold. This process worked in reverse with regard to incoming ships, with the longshoremen removing the cargo from the ship piece by piece and transporting it to the tailgate of the truck, from which point truckers would deliver it to intermediate warehouses for shipment to the ultimate consignee.

As might be expected, moving cargo in this break-bulk manner proved expensive and inefficient. Following World War II, therefore, steamship carriers operating between New York and Puerto Rico began to carry cargo in small (8' × 8' × 8') reusable wooden receptacles called "Conex" and "Dravo" boxes. Initially, these boxes—the forerunners of the modern container—were "stuffed" (loaded) and "stripped" (unload-

---

1. *NLRB v. Int'l Longshoremen's Ass'n*, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980).

2. For excellent background into the historical development and practical consequences of containerization, *see* Ross, *Waterfront Labor Response to Technological Change: A Tale of Two Unions,* 21 Lab.L.J. 397 (1970); Schmeltzer and Peavy, *Prospects and Problems of the Container Revolution,* 1 J.Mar.L. & Comm. 203 (1970).

ed) exclusively at the pier by ILA labor. Later, however, steamship companies made them available to shippers and others for stuffing and stripping off-pier by non-ILA labor. By the mid-1950's, larger metal containers began to replace the wooden boxes. Then in 1957 an event of enormous importance to the development of the shipping industry occurred: the first "container-ship" took to the sea, designed specifically to move containers that would ultimately range up to forty feet in length. Within a decade, steamship companies began using containerships in other American ports, and in the North Atlantic trade routes between New York and the principal ports of Western Europe. By the mid-1970's container-ized cargo inevitably reached all across the globe.

From the early days of containerization, its advantages loomed large. The Supreme Court succinctly described them as follows:

> The use of containers is substantially more economical than traditional methods of handling ocean-borne cargo. Because cargo does not have to be handled and repacked as it moves from the warehouse by truck to the dock, into the vessel, then from the vessel to the dock and truck or rail to its destination, the costs of handling are significantly reduced. Expenses of separate export packaging, storage, losses from pilferage and breakage, and costs of insurance and processing cargo documents may also be decreased. Perhaps most significantly, a container ship can be loaded or unloaded in a fraction of the time required for a conventional ship. As a result, the un-profitable in-port time of each ship is reduced, and a smaller number of ships are needed to carry a given volume of cargo.

*NLRB v. International Longshoremen's Ass'n,* 447 U.S. at 494–95, 100 S.Ct. at 2308–09 (footnotes omitted). In short, no one has ever doubted that containerization has enabled ocean-borne cargo to be moved in a strikingly more economical fashion than it had traditionally been moved.

But the effects of the innovation have not been unequivocally favorable. As has been the case with most important technological changes, containerization has promoted efficiencies and economies but at the same time has wrought some dislocations and hardships. Although the productivity of longshoremen has dramatically increased, the number of jobs and the quantum of work available to them has sharply declined. In the Port of New York alone, for instance, the record reveals that annual employment slipped from 43,000,000 man-hours in 1958 to less than 20,000,000 in 1977 while the annual volume of cargo shipped through the port doubled. The slippage in employment has been the genesis of a long and bitter dispute between the various parties affected in which they have sought to come to terms with the two-edged consequences of an important technological advance.

As early as 1958, containerization had begun to make inroads into traditional longshoremen work, and the ILA could sense the shadows of impending storms. Not surprisingly, therefore, the first of a host of disputes between various east coast shipping employer associations and the ILA arose at about this time, with the shipping industry insisting that containers be permitted to move on and off the pier without any restrictions. The ILA insisted just as vociferously that it had the right to dictate the conditions under which its members would move the containers. These preliminary skirmishes—including a grievance by the Union that resulted in an arbitration ruling [3] requiring the ILA to handle containers it had theretofore refused to handle—culminated in the first set of collective bargaining negotiations to address the problems wrought by containerization. These 1959 negotiations between the ILA and the New York Shipping Association (NYSA) opened with the Union demanding that all containers be stripped and stuffed at the pier by the longshoremen. The Shipping Association countered with equally in-

---

**3.** See Ross, *supra* note 2, at 401.

flexible demands. Ultimately, however, the parties carved out an agreement.

In the agreement, the ILA conceded that any member of NYSA "shall have the right to use any and all type[s] of containers without restriction or stripping by the union." In return, NYSA made two important concessions. It agreed, first, to pay the ILA royalties on containers stripped or stuffed away from the pier by non-ILA labor. Second, NYSA agreed that

> Any work performed in connection with the loading and discharging of containers for employer members of NYSA which is performed in the Port of Greater New York whether on piers or terminals controlled by them, or whether through direct contracting out, shall be performed by ILA labor at longshore rates.

Whatever the merits of the 1959 agreement, it produced little tranquility. Grievances, work stoppages, and wildcat strikes blanketed the rapidly developing container shipping industry for most of the next decade. At least in part, this strife-ridden state of affairs stemmed from the conspicuously different interpretations the parties placed on an arguably ambiguous portion of the 1959 agreement. The ILA claimed that it had agreed to permit the free movement over the pier of only those containers that were "full shippers' loads" (FSLs)— containers holding goods beneficially owned by only one shipper or consignee. With respect to consolidated loads (also called "less than trailer loads" (LTLs) or "less than container loads" (LCLs)), containers holding goods belonging to more than one shipper or consignee, the ILA contended that it had retained the right to have its members stuff and strip such containers at the pier. The Shipping Association, on the other hand, claimed that the agreement essentially left it free insofar as consolidated loads were concerned, provided it made royalty payments on those loads not handled by ILA labor. The unrest generated by this conflict in interpretation led NYSA to make this 1962 concession:

> Where an employer-member of NYSA supplies a container which is the property of such member, to a consolidator for loading or discharging of cargo in the Port of Greater New York, it will be stipulated that such container must be loaded or unloaded by ILA at longshore rates.

Throughout the 1960's, containerization assumed an increasingly prominent role on the waterfront. By 1967 containerized cargo constituted 20 percent of all cargo handled in the Port of New York. That year also marked the introduction of the first containership into the important North Atlantic trade route, which had previously been served exclusively by conventional vessels. In short, it had become abundantly clear that containerization had become an integral part of the ocean-borne shipping industry.

For obvious strategic reasons, this realization prompted the ILA to assume a posture of strict intransigence. With contract negotiations looming ahead for the summer of 1968, the Union in July 1967 adopted a resolution demanding once again that *all* containers be stuffed and stripped by ILA labor. Compliance with such a demand, of course, would have defeated the entire purpose of the technological breakthrough, as the Union well understood. It nevertheless opened the subsequent negotiations on exactly that note. NYSA countered with the equally unrealistic demand that all existing restrictions on the free movement of containers be eliminated. A strike ensued, lasting 56 days in the Port of New York and about twice that long in other Atlantic and Gulf ports. Only the appointment of a presidential board of inquiry pursuant to the emergency provisions of the Taft-Hartley Act brought the parties back to the bargaining table.

Out of this less than promising atmosphere emerged the Rules on Containers. Though difficult to summarize with precision, the Rules essentially provided that if containers owned or leased by the shipping companies carrying consolidated loads were to be stuffed or stripped within a radius of

50 miles of the local port area by anyone other than the employees of the beneficial owner of the cargo, that work must be performed at the piers by ILA labor. The Rules also contained a liquidated damages provision for any container handled in violation of the Rules, and required the shipping companies to pay a royalty on any container that passed over the pier intact. As a practical matter, the effect of the agreement preserved only about 20 percent of the containerized cargo to the longshoremen for stuffing and stripping, with the remaining 80 percent passing over the pier intact. In 1971 the ILA and the Council of North Atlantic Shipping Associations (CO-NASA), a new multi-employer bargaining association representing the steamship companies, renewed the 1968 Rules, increasing the liquidated damage provision to $1000 per container.

Despite the existence of the Rules, the ILA steadfastly maintained that the shipping companies continued to permit and even encourage violations of the Rules. The Union therefore threatened to invoke its contractual right to suspend the Rules, a euphemistic way of suggesting that the longshoremen might refuse to handle any container stripped or stuffed inland. To mollify the Union, the parties met in Dublin, Ireland in January 1973 and executed an "interpretive bulletin" to the Rules designed to ensure their effective enforcement. In fact, however, the "Dublin Supplement"—as the agreement came to be called—accomplished a good deal more than merely the strengthening of enforcement mechanisms. In particular, the Supplement declared that the Rules applied to all containers—including FSL containers—that were stuffed or stripped within 50 miles of the port area by anyone other than the beneficial owner's employees. This brought within the ambit of the Rules FSL containers that, although destined for delivery intact to their consignees, were stopped short of their ultimate destinations and stripped at warehouses or trucking stations within the local port area. This prohibition on "shortstopping," as the practice came to be known, signified that such FSL contain-

ers lose their designation as such when shortstopped and become much more like consolidated loads, thereby triggering the ILA's right to perform such work at the pier. The parties nevertheless agreed to except from the restrictions on shortstopping any FSL containers that would be warehoused within the 50 mile port area for a minimum of 30 days.

At the conclusion of their 1974 negotiations, the parties agreed to retain the Rules as interpreted by the Dublin Supplement. The ILA continued to express indignation, however, at what it claimed to be recurring violations of the Rules by the shipping companies. In April 1975, the Union's indignation led it to suspend the Rules, and longshoremen stripped at the pier all containers except the FSLs. After a month, however, the parties settled the dispute by eliminating the 30 day warehouse exception insofar as it applied to export cargo and tightening it with regard to import cargo. In 1977, the parties again agreed to retain the Rules.

To summarize, the Rules now provide that if containers owned or leased by the shipping companies are to be stuffed or stripped within the local port area, that is, within a radius of 50 miles of the pier, by anyone other than the employees of the beneficial owner of the cargo, that work must be performed at the pier by ILA labor. Consolidated container loads coming from or bound for points outside the 50 mile area need not be stuffed or stripped by the longshoremen. FSL containers that are transported intact to or from the beneficial owner or any inbound FSL warehoused within the 50 mile area for at least 30 days likewise need not be stuffed or stripped by ILA labor.

## II.

### A.

Since 1970, the legitimacy of the Rules has been the subject of an extraordinary amount of litigation. Opponents first endeavored to challenge the Rules by contending that their enforcement violated the

antitrust laws. The Second Circuit rejected the claim, however, concluding that the Rules came under the labor exemption. *Intercontinental Container Transport Corp. v. New York Shipping Ass'n*, 426 F.2d 884 (2nd Cir.1970).

Opponents then began a prolonged attack on the Rules as violative of sections 8(e) and 8(b)(4)(B) of the National Labor Relations Act, 29 U.S.C. §§ 158(e) and 158(b)(4)(B).[4] Between 1973 and 1979, the Board's General Counsel issued numerous unfair labor practice complaints, alleging in each instance that the Rules and their enforcement constituted impermissible secondary activity. Federal courts thereupon enjoined enforcement of the Rules in numerous ports up and down the east coast pending final disposition of the charges.[5]

In its first consideration of the matter, *Consolidated Express, Inc.*, 221 N.L.R.B. 956 (1975), *enforced*, 537 F.2d 706 (2d Cir. 1976), *cert. denied* 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977), *vacated and remanded*, No. 75–4266 (2d Cir. Oct. 1, 1980) (*Conex*), the Board held against the ILA and NYSA, concluding that the Rules and their enforcement—at least insofar as applied to off-pier consolidators—violated the Act's proscriptions against secondary activity. In so concluding, the Board recognized that the resolution of the issue turned on whether the Rules and their enforcement were designed to *preserve* longshore work for ILA employees or rather to *acquire* work traditionally performed by

others, 221 N.L.R.B. at 959, and that the answer to that question in turn depended upon the precise definition of the work in controversy. *Id.* The Board proceeded to define the work in controversy as the off-pier consolidation into containers of LCL/LTL cargo. Almost by definition, of course, such work had never been performed by ILA labor. The Board therefore concluded that the Rules and their enforcement violated the Act.

A divided panel of the Second Circuit enforced the Board's order. 537 F.2d 706. Judge Feinberg, dissenting, contended that the Board's decision rested upon "a fundamental error": the work in controversy, he argued, must be viewed not from the perspective of the intervening complaining parties (there, off-pier consolidators) but from the perspective of the pre-agreement work of the bargaining unit employees, the longshoremen. 537 F.2d at 712–14. For only by a careful examination of what longshoremen did prior to containerization, Judge Feinberg reasoned, can we determine whether the Rules seek to preserve that work. When the United States Supreme Court ultimately addressed the troublesome issues wrought by containerization, it adopted *sub silentio* the persuasive analytical framework set forth by Judge Feinberg. *NLRB v. International Longshoremen's Ass'n*, 447 U.S. 490, 503–13, 100 S.Ct. 2305, 2312–18, 65 L.Ed.2d 289 (1980).

**4.** Section 8(e) provides in pertinent part:
   It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void ....
   Section 8(b)(4)(B) provides in pertinent part:
   It shall be an unfair labor practice for a labor organization or its agents—to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where ... an object thereof is—

forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person .... *Provided*, That nothing contained in this clause ... shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing ....

**5.** *Balicer v. Int'l Longshoremen's Ass'n*, 364 F.Supp. 205 (D.N.J.1973), *aff'd without opinion*, 491 F.2d 748 (3d Cir.1973) (Port of New York); *Humphrey v. Int'l Longshoremen's Ass'n*, 548 F.2d 494 (4th Cir.1977) (Hampton Roads); *Humphrey v. Int'l Longshoremen's Ass'n*, No. Y–75–1395 (D.Md. March 25, 1976) (Baltimore); *Hirsch v. Int'l Longshoremen's Ass'n*, No. 79–2022 (E.D.Pa. June 12, 1979) (Philadelphia).

Before the Supreme Court considered the issue, however, the Board relied on *Conex* to adhere to its view that the Rules and their enforcement violated the Act. *See, e.g., International Longshoremen's Ass'n (Associated Transport, Inc.)*, 231 N.L.R.B. 351 (1977); *International Longshoremen's Ass'n (Dolphin Forwarding, Inc.)*, 236 N.L.R.B. 525 (1978); *International Longshoremen's Ass'n (Beck Arabia, Ltd.)*, 245 N.L.R.B. 1325 (1979); *International Longshoremen's Ass'n (The Terminal Corporation)*, 250 N.L.R.B. 8 (1980). Courts of appeals likewise leaned heavily on the Second Circuit decision in *Conex* to reach their conclusions that the Rules and their enforcement could not stand. *See International Longshoremen's Ass'n Local 1575 v. NLRB*, 560 F.2d 439 (1st Cir.1977); *cf. Humphrey v. International Longshoremen's Ass'n*, 548 F.2d 494 (4th Cir.1977).

In 1979, however, a divided panel of the District of Columbia Circuit denied enforcement of the Board's orders in both *Associated Transport* and *Dolphin Forwarding*, concluding that the Board had erred in defining the work in controversy. The court noted that the Rules "represent a reasoned response to the difficult problem of technological innovation" and "seek neither to stymie technological innovation nor to introduce manual labor in situations where the work otherwise would be handled by more efficient mechanized means." *International Longshoremen's Ass'n v. NLRB*, 613 F.2d 890, 914 (D.C.Cir.1979). Because of the conflict among the circuits, the Supreme Court granted certiorari to help resolve the difficult legal problems containerization had engendered. 444 U.S. 1042, 100 S.Ct. 727, 62 L.Ed.2d 728 (1980).

### B.

In *NLRB v. International Longshoremen's Ass'n*, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980), a sharply divided Supreme Court affirmed the District of Columbia Circuit, holding that the Board's definition of the work in controversy "reflect[ed] a fundamental misconception of the work preservation doctrine" and was

therefore "erroneous as a matter of law." *Id.* at 507, 511 n. 26, 100 S.Ct. at 2317 n. 26. Accordingly, the Court remanded *Dolphin Forwarding* and *Associated Transport* to the Board with instructions to reconsider the unfair labor practice complaints in light of the principles set forth by the Court. Because the Court's discussion provides the guidelines within which we must operate, a more detailed examination of the decision will be instructive.

The Court began its discussion with an account of the historical development of containerization, the tensions created by the innovation, and the accommodations ultimately reached by labor and management to reconcile their differences. *Id.* at 493–503, 100 S.Ct. at 2308–2313. It then turned the inquiry to sections 8(b)(4)(B) and 8(e) of the Act and their prohibitions on secondary activity. This required the Court to synthesize two of its previous decisions, *National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), and *NLRB v. Enterprise Ass'n of Pipefitters*, 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977).

In *National Woodwork*, a collective bargaining agreement between a carpenter's union and a general contractor's association provided that union members would not handle any doors that had been pre-fitted, i.e., prepared for installation prior to shipment to the jobsite. A general contractor subject to the agreement initially ordered the pre-fitted doors, but returned them when the union instructed its members not to handle them. Opponents of the "will not handle" contract provision filed charges against the union, contending that the provision violated sections 8(e) and 8(b)(4)(B). The Board dismissed the charges, 149 N.L.R.B. 646 (1964), but the Court of Appeals for the Seventh Circuit reversed. *National Woodwork Manufacturers Ass'n v. N.L.R.B.*, 354 F.2d 594 (7th Cir.1965). In reversing the Seventh Circuit, the Supreme Court stated:

> The determination whether the "will not handle" sentence ... and its enforcement violated § 8(e) and 8(b)(4)(B) cannot

be made without an inquiry into whether, under all the surrounding circumstances, the Union's objective was preservation of work for ... employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere.... The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees.

386 U.S. at 644–45, 87 S.Ct. at 1268–69 (footnote omitted). Because the Board found that the task of cutting and fitting doors had traditionally been performed by carpenters at the jobsite, the Court concluded that the agreement and its enforcement constituted work preservation and therefore did not fall within the evil Congress intended to prevent when it enacted sections 8(b)(4)(B) and 8(e).

Ten years after *National Woodwork*, the Court refined the work preservation doctrine. In *Pipefitters*, a subcontractor on a construction job had a pre-existing collective bargaining agreement with its steamfitting employees under which all pipe threading and cutting would be performed on the jobsite by the steamfitters, who traditionally performed such work. Despite this agreement, the general contractor (with whom the union had no contract) specified that the pipes installed for this job were to be threaded and cut prior to their shipment to the jobsite, and the subcontractor agreed. When the units arrived, the steamfitters refused to install them. As a result, the general contractor filed an unfair labor practice charge, claiming that the union sought to prevent the subcontractor from doing business with it. The Board agreed with the general contractor that the union's enforcement of the agreement violated section 8(b)(4)(B), concluding that although the collective bargaining agreement itself constituted a legitimate exercise of the work preservation doctrine, the effort to enforce it in a situation in which the coerced employer lacked the right to control the award of the work transformed the activity from primary (and

thus permissible) to secondary (and thus impermissible). 204 N.L.R.B. 760 (1973).

A divided Court of Appeals for the District of Columbia Circuit, sitting en banc, set aside the Board's order, *Enterprise Ass'n of Pipefitters v. N.L.R.B.*, 521 F.2d 885 (1975), concluding that it violated the spirit of *National Woodwork*. The Supreme Court reversed, agreeing with the Board that the mere existence of a collective bargaining agreement that withstands analysis under section 8(e) does not immunize secondary activity otherwise proscribed by section 8(b)(4)(B). Because the Court concluded that there existed substantial evidence on the record to support the Board's determination that the union exerted pressure on the subcontractor in order to influence the general contractor, it held that the court of appeals had overstepped its bounds in substituting its assessment of wise labor policy for that of the Board.

Having examined *National Woodwork* and *Pipefitters*, the *ILA* Court concluded:

[A] lawful work preservation agreement must pass two tests: First, it must have as its objective the preservation of work traditionally performed by employees represented by the union. Second, the contracting employer must have the power to give the employees the work in question—the so-called "right of control" test ....

447 U.S. at 504, 100 S.Ct. at 2313.

The Court proceeded to explain how such a test should be applied in the case at hand, admitting that the threshold question—"[w]hat is the 'work' that the agreement allegedly seeks to preserve?"—posed a significantly more troublesome problem than had been the case in *National Woodwork* or *Pipefitters:*

Identification of the work at issue in a complex case of technological displacement requires a careful analysis of the traditional work patterns that the parties are allegedly seeking to preserve, and of how the agreement seeks to accomplish that result under the changed circumstances created by the technological advance. The analysis must take into ac-

count "all the surrounding circumstances," *National Woodwork*, 386 U.S. at 644, 87 S.Ct. at 1268, including the nature of the work both before and after the innovation.... Whatever its scope, however, the inquiry must be carefully focused: to determine whether an agreement seeks no more than to preserve the work of bargaining unit members, *the Board must focus on the work of the bargaining unit employees, not on the work of other employees who may be doing the same or similar work,* and examine the relationship between the work as it existed before the innovation and as the agreement proposes to preserve it.

*Id.* 447 U.S. at 507, 100 S.Ct. at 2315 (emphasis added) (footnote omitted).

The Court made clear, however, that the Board must do more than merely improve its definition of the work in controversy:

The next step is to look at how the contracting parties sought to preserve that work, to the extent possible, in the face of a massive technological change that largely eliminated the need for cargo handling at intermediate stages of the intermodal transportation of goods, and to evaluate the relationship between traditional longshore work and the work which the Rules attempt to assign to ILA members.... *The legality of the agreement turns, as an initial matter, on whether the historical and functional relationship between this retained work and traditional longshore work can support the conclusion that the objective of the agreement was work preservation rather than the satisfaction of union goals elsewhere.*

*Id.* at 509–10, 100 S.Ct. at 2316–17 (emphasis added) (footnotes omitted).

Finally, the Court reminded the Board that it need address the "right of control" issue only if it first finds that the Rules have a lawful work preservation objective. *Id.* at 512, 100 S.Ct. at 2317.[6]

## C.

On remand, Administrative Law Judge (ALJ) Joel A. Harmatz made an exhaustive analysis of the record and the applicable law. His detailed findings amply demonstrate that the work the longshoremen sought to claim under the Rules meets the Supreme Court's test of being "historical[ly] and functional[ly] relat[ed]" to their traditional, pre-containerization work. In addition, the ALJ carefully considered the argument of opponents of the Rules that the Rules lacked a work preservation objective because containerization had created an entirely new intermodal transportation system that rendered obsolete the traditional ILA work of loading and unloading cargo by inseparably integrating that work into the services provided by others. He rejected the argument, finding that the loading and unloading of cargo has remained a distinctly independent task capable of being performed at a variety of locations. He likewise rejected the alternative contention that, on the basis of the 1959 agreement with NYSA, the longshoremen had abandoned any claim they might otherwise have had to the stuffing and stripping of containers.

The ALJ then turned to the other leg of the Court's two-part test, the "right of control" issue. He found that although the shipping companies release containers to shippers, importers, and their agents by virtue of contractual arrangements, the companies own or lease the containers and can therefore prescribe the conditions under which they may be released. He thus

**6.** Pursuant to the remand, the Second Circuit recalled its mandate in *Conex* and remanded the case to the Board. No. 75–4266 (Oct. 1, 1980). The Fourth Circuit likewise remanded *Beck Arabia* and the Fifth Circuit did the same with *Puerto Rico Marine Management.* The Board decided *sua sponte* to reconsider its decision in *Terminal.* At the time of the remand, it had not yet rendered decisions in *Hill Creek Farms* or

*Custom Brokers.* On January 18, 1981, the Board consolidated the eight cases. On February 18, it remanded them to an administrative law judge for a hearing and decision on issues raised by the Supreme Court. Because a new complaint issued in *American Trucking* on February 10, the Board on February 20 ordered that case consolidated with the other eight.

concluded that under such circumstances the "right of control" resides with the shipping companies, the parties to the Rules. The ALJ then rejected the "mischievous" contention that a Federal Maritime Commission decision, casting doubt on the legality of the Rules under the federal shipping laws, should play a role in the determination of whether the shipping companies lack the "right of control" for purposes of the National Labor Relations Act, concluding that each administrative agency should confine itself primarily to its own realm of expertise.

As our recapitulation of his analysis suggests, the ALJ found both that the work the ILA sought to retain under the Rules bore a "historical and functional relationship" to traditional longshore work *and* that the shipping lines had the right to control the stuffing and stripping of containers. This pair of findings might well have led him to conclude that, in light of the standard set out by the Supreme Court, the Rules and their enforcement were in no way inconsistent with the Act. But the ALJ went one step further. Evidently believing that an otherwise valid work preservation agreement sheds its "preservative" identity and assumes an "acquisitive" one when applied "at the expense of" workers whose jobs existed prior to the development of the new technology, he concluded that the enforcement of the Rules violated the Act insofar as their enforcement sought to reach shortstopping by truckers and a narrow range of "traditional" warehouse practices. In so concluding, the ALJ made no finding that the longshoremen in fact "acquired" *anything* "at the expense of" *anyone*, i.e., that the stuffing and stripping of containers at the pier eliminates or diminishes work performed off-pier in these situations by truckers and warehousemen.

On the basis of his analysis, the ALJ recommended that the complaints in five cases—*American Trucking, Conex, Dol-phin Forwarding, Puerto Rico Marine Management,* and *Hill Creek Farms*—be dismissed in their entirety and that the orders pending in three others—*Associated Transport* (shortstopping) *Beck Arabia* (warehousing), and *Terminal* (warehousing)—be modified to invalidate the Rules only insofar as they proscribe shortstopping and certain traditional warehouse practices.[7]

On February 28, 1983, the Board issued an order in which it adopted the findings, conclusions, and recommendations of the ALJ. In two respects, however, the Board "clarif[ied]" his decision.

First, the Board—observing that the ALJ had neglected to do so—set out an explicit definition of what it believed to be the work in controversy:

> [W]e find that the work in dispute is the initial loading and unloading of cargo within 50 miles of a port into and out of containers owned or leased by shipping lines having a collective-bargaining relationship with the ILA.

The Board then addressed that portion of the analysis in which the ALJ had concluded that, in two sets of circumstances, the Rules could not be sustained. Recognizing that the ALJ had committed a serious conceptual error in his approach, the Board divorced itself completely from this portion of the analysis:

> By focusing on the economic character of the trucking and warehousing industry and on the work historically performed by trucking and warehousing employees, the Administrative Law Judge's analysis appears to conflict with the Supreme Court's directions to us in its remand on this case. While the Supreme Court stated that our inquiry in this complex case would "require a broader view, taking into account the transformation of several interrelated industries or types of work ...," the Court continued to emphasize that "the inquiry must be carefully focused ... on the work of the

---

7. In *Custom Brokers,* the ALJ found an 8(e) violation that has not been challenged.

bargaining unit employees, not on the work of other employees who may be doing the same or similar work ...." The Administrative Law Judge's findings give undue emphasis to the work historically performed by trucking and warehousing employees and to the fact that this work was not created by containerization. We find that the proper emphasis is on the traditional work of the longshoremen and what has happened to that work.

Despite its finding that the ALJ had improperly applied the pertinent law to the shortstopping and warehousing areas, the Board attempted to sustain his conclusion that the Rules violated the Act in these two areas on another ground. The Board stated that, with regard to these two areas, the work that the longshoremen performed prior to containerization "no longer exists as a step in the cargo-handling process." Thus, on the basis of this finding that such work had been "eliminated," the Board concluded the ILA's attempt to preserve it through collective bargaining became tainted with "an illegal work acquisition objective." The Board reached this conclusion in the absence of any finding that the stuffing and stripping of containers at the pier eliminates or diminishes work performed off-pier in these situations by truckers and warehousemen.

Accordingly, the Board adopted the proposed order of the ALJ with regard to each of the nine cases before it. Pursuant to section 10(f) of the Act, 29 U.S.C. § 160(f), both the opponents of the Rules and the parties to the Rules have petitioned for review of those portions of the Board's order adverse to their interests. Pursuant to section 10(e) of the Act, 29 U.S.C. § 160(e), the Board has applied for enforcement of its order.

### III.

■ As our narrative of the history of this dispute suggests, this case implicates important questions of law, economics, and public policy. It must be remembered, however, that fundamental principles of appellate review circumscribe the boundaries of our task. As to questions of fact, we may not disturb any finding of the Board that is supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951); *Virginia Electric & Power Co. v. NLRB*, 703 F.2d 79, 81 n. 2 (4th Cir.1983). We are, of course, obliged to correct any error of law made by the Board. *Allied Chemical & Alkali Workers Local 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 166, 171–72, 92 S.Ct. 383, 393–94, 30 L.Ed.2d 341 (1971); *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947). With these principles firmly in mind, we turn to the issues before us.

### A.

■ As previously discussed, the Supreme Court in *ILA* held that, to be a lawful exercise of the work preservation doctrine, a collective bargaining agreement must contain two elements. First, it must seek to preserve work traditionally performed by employees of the bargaining unit. Second, it must be addressed to an employer who actually has the power to assign the work in question. 447 U.S. at 504, 100 S.Ct. at 2313. The Board found that the Rules on Containers satisfy both requirements. We believe that substantial evidence exists in the record to support each of these factual findings.

Prior to the Court's decision in *ILA*, the Board (and most courts that faced the issue) consistently went awry by failing to grasp that the proper approach to the "work preservation objective" leg of the test entailed a comparison between the pre-containerization work of the longshoremen and the work they sought to claim under the Rules. Those few judges and members of the Board who managed to see this uniformly concluded that the Rules had a valid work preservation objective. *See, e.g., Conex*, 221 N.L.R.B. at 979 (1975) (ALJ Arnold Ordman); *Conex*, 537 F.2d at 712–14 (2d Cir.1976) (Feinberg, J., dissenting); *Humphrey v. International Longshoremen's Ass'n*, 401 F.Supp. 1401 (E.D. Va.1975) (Merhige, J.), *rev'd*, 548 F.2d 494, 500–01 (4th Cir.1977) (Craven, J., dissenting); *The Terminal Corporation*, 250 N.L.

R.B. 8 (1980) (Chairman Fanning, dissenting); *Associated Transport*, 231 N.L.R.B. 351, 353–57 (1977) (Chairman Fanning, dissenting), *rev'd*, 613 F.2d 890, 908–10 (D.C. Cir.1979). In so concluding, these individuals recognized that which Judge Friendly, in another context, had incisively stated:

Stripping a container of goods ... is the functional equivalent of sorting cargo discharged from a ship; stuffing a container is part of the loading of the ship even though it is performed on shore and not in the ship's cargo holds.

*Pittston Stevedoring Corp. v. Dellaventura*, 544 F.2d 35, 53 (2d Cir.1976).

The Court set the matter straight in *ILA* by clearly instructing the Board to "focus on the work of the bargaining unit employees, not on the work of other employees who may be doing the same or similar work." 447 U.S. at 507, 100 S.Ct. at 2315. This the Board did. Not surprisingly, it had little trouble finding that "the work of loading and unloading containers claimed by the Rules is functionally related to the traditional loading and unloading work of the longshoremen." It therefore concluded that the Rules indeed had the objective of preserving the steadily dwindling volume of work when the ILA negotiated them. We believe the Board could not have concluded otherwise. Traditionally, longshoremen loaded cargo piece by piece into the hold of the ship and unloaded it piece by piece from the hold. The Rules grant them the right in certain instances to load cargo piece by piece into containers and unload it piece by piece from containers. In short, containerization has simply changed the locus of the work, moving the operation shoreward.

Up until the Court decided *ILA*, no one seriously contended that the Rules violated the Act for failure to meet the "right of control" test of *Pipefitters*. In part, of course, this reality stemmed from the success of opponents of the Rules in winning the battle on the basis of the Board's mistaken approach to the work preservation issue. We believe, however, that an additional explanation underlay the absence: the argument that the shipping lines do not have the right to control the container work sought by the longshoremen lacks any semblance of merit.

After the Supreme Court decided *ILA*, opponents of the Rules—correctly sensing that the very foundation of their work preservation argument had been cut out from under them—constructed a sophisticated "right of control" argument that rested on a decision of the Federal Maritime Commission. *Sea-Land Service, Inc. —Proposed Rules on Containers*, 21 F.M.C. 1 (1978), *aff'd in part and remanded in part sub nom. Council of North Atlantic Shipping Ass'ns v. FMC*, 672 F.2d 171 (D.C.Cir.1982), *cert. denied*, 459 U.S. 830, 103 S.Ct. 69, 74 L.Ed.2d 69 (1982), *on remand* Nos. 73–17 & 74–40 (FMC May 19, 1982), *vacated and remanded*, No. 78–1776, Supplemental Opinion Following Remand (D.C.Cir. July 2, 1982), *reh'g en banc denied*, No. 78–1776 (D.C.Cir. Sept. 23, 1982). Whatever appeal that argument may have commanded—and the ALJ, after an exhaustive analysis, concluded that it commanded none—it has now become moot, for the decision on which it rested has been vacated. *Council of North Atlantic Shipping Ass'ns v. FMC*, 690 F.2d 1060 (D.C.Cir.1982) (per curiam).

As the Board found, the shipping companies invested their own capital in the development of the technology of containerization. They own or lease the containers. They prescribe the conditions under which they may be released to shippers, consolidators, truckers, and warehousemen who might otherwise choose to utilize the containers so as to violate the Rules. In sum, the Board had little difficulty finding that the shipping lines retain the right to control the allocation of the work sought by the ILA under the Rules. Substantial evidence exists to support this finding.

**B.**

■ As noted above, despite its findings that the Rules embody a lawful work preservation objective and that the shipping companies retain the right to control the assignment of the work sought to be claimed, the Board went on to conclude that the enforcement of the Rules in two instances violates the Act's proscriptions

against secondary activity. With regard to both shortstopping by truckers and some traditional warehousing functions, the Board concluded that, because the Rules sought to preserve for the longshoremen work that had been rendered superfluous by the change in technology and not work that had been diverted to others, the effort to do so violates the Act. In so concluding, we believe the Board erred as a matter of law.[8]

Prior to containerization, both the longshoremen and the truckers handled the break-bulk cargo as it moved from the ship to the consignee. Longshoremen would perform the initial unloading of the ship, moving the cargo piece by piece to the local seaport terminal. From there, truckers usually hauled the cargo to their own terminal or freight station, where they would reload it into their over-the-road equipment. With containerization, the off-pier work of the shortstopping truckers remains essentially unchanged except that they unload cargo from containers instead of from motor trucks. And with containerization, of course, the work formerly performed by the longshoremen has been rendered unnecessary because the container can be fastened to the chassis of a truck and transported intact to the trucking terminal or freight station.

From these unassailable facts, the Board concluded that the ILA's attempt to preserve under the Rules loading and unloading of cargo constitutes "unlawful work acquisition." But the Board conspicuously failed to ground this conclusion of law in the only finding of fact that might support it: that the Rules, in preserving for ILA members the right to do this initial loading and unloading, somehow deprive the truckers and warehousemen of *their* off-pier work by transferring all or some of it to longshoremen at the pier. Put another way, the Board hung the "work acquisition" tag on the Rules in these two instances without a finding that the longshoremen acquired anything. Careful examination of the respective work patterns of longshore-

men, truckers, and warehousemen reveals quite clearly why the Board failed to make this finding: the facts would not support it. Prior to containerization, truckers and warehousemen handled the cargo break-bulk; unloading of the cargo from the hold of the ship by the longshoremen obviously did not hinder these off-pier practices. Thus, one cannot possibly maintain that the stripping of import containers at the pier would in any way prevent the identical off-pier work. To repeat, truckers and warehousemen do precisely what they did before the change in technology; the longshoremen have acquired none of that work. Although the longshoremen's work in this process may well duplicate the off-pier work of truckers and warehousemen, calling this set of circumstances "work acquisition" strikes us as particularly inappropriate. And it is not our function as a court of review to weigh the economic cost of the Rules.

Were we writing on a clean slate, the work preservation doctrine implicitly espoused by the Board—that work rendered unnecessary by technological change may not be properly preserved in a collective bargaining agreement—might well meet with our approval. Nothing could be clearer, however, than that we do not write on a clean slate. The Supreme Court in *National Woodwork* made absolutely clear that, in enacting sections 8(b)(4)(B) and 8(e), Congress did not intend to prohibit a collective bargaining agreement that has as its "sole objective the protection of union members from a diminution of work flowing from changes in technology." 386 U.S. at 648–50 (Harlan, J., concurring). Such an agreement, the Court held, constituted primary and therefore legitimate union activity. The Board's attempt to carve out a novel work preservation doctrine flies in the face of *National Woodwork*.

The Board itself seems to have recognized the problem with its analysis. At the end of its decision, it purported to anchor its "work acquisition" conclusion in a cursory reference to two cases that the ALJ,

---

**8.** Because the Board made the identical error of law with regard to both shortstopping and warehousing, we will illustrate that mistake by using the shortstopping example only.

after a probing review, had found to be completely inapposite. *Carrier Air Conditioning Co. v. NLRB,* 547 F.2d 1178 (2d Cir.1976), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977); *Associated General Contractors v. NLRB,* 514 F.2d 433 (9th Cir.1975). These "new product" cases stand for the proposition that a collective bargaining agreement violates the principles of *National Woodwork* when it seeks to claim work so different from that traditionally performed by the bargaining unit employees that it constitutes a "new product" and requires skills more sophisticated than can be offered by those who claim the work. In such cases, the objective takes on a secondary taint because the bargaining unit employees in reality seek to acquire the work performed by the employees of the manufacturer of the "new" product. Such a proposition, as the ALJ found, has no place in the containerization dispute.

In sum, we believe the Board misapplied the doctrine of work preservation in concluding that the Rules violate the Act insofar as they are applied to shortstopping and a narrow range of warehouse practices. We hold that the Rules are lawful in their entirety and may be enforced.

### IV.

We noted above that this case raises troublesome questions of law, economics, and public policy. Surely the most troublesome question raised by this long-standing dispute concerns the matter of duplicative work. The Supreme Court has declared, first in *National Woodwork* and more recently in *ILA,* that in cases such as this the efficient use of resources may not serve as a guide to disposition because Congress has indicated that it ascribes greater value to the collective bargaining mechanism than to economic niceties. We well understand that our conclusion that the Rules on Containers do not violate the Act clears the way for longshoremen to do an entire range of work that arguably no longer serves any economic purpose. In the final analysis, however, our obligation is to apply the laws that Congress has given us, not to close our eyes to them.

The petitions for review in *American Trucking, Conex, Dolphin Forwarding, Puerto Rico Marine Management,* and *Hill Creek Farms* are denied. The application for enforcement in *Associated Transport, Beck Arabia,* and *Terminal* is denied and the petitions for review are granted. The application for enforcement in *Custom Brokers* is granted.